**Al DiFRANCO, Plaintiff,**

v.

**CITY OF CHICAGO, Carol Witherell-Niec, Anthony Campele, Richard Paul, Larry Lindberg, Cornell Hughes, George Berndt and Paul Lewis, Defendants.**

**No. 85 C 9349.**

United States District Court, N.D. Illinois, E.D.

July 22, 1986.

John Stainthorpe, Chicago, Ill., for plaintiff.

Michael Small, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Al DiFranco ("DiFranco") worked as a photographer in the "Graphics and Reproduction Center" of the City of Chicago until he was fired by his supervisor Carol Witherell-Niec ("Witherell-Niec"). He sues both the City and Witherell-Niec, under 42 U.S.C. § 1983, alleging that he was fired because of speech protected by the First Amendment. Both defendants have moved to dismiss, arguing that the record is clear that DiFranco was fired for reasons other than his speech, and, alternatively, that his speech was unprotected. The City also moves to dismiss under the *"Monell* doctrine." For the reasons stated below, the first motion is denied and the second is granted.

At the outset, we must recast defendants' motion to dismiss as one for summary judgment, since they rely on documents other than the pleadings in arguing their case. *See* Fed.R.Civ.P. 12(b). We cannot grant this reconstituted motion unless "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The Court must view the evidence in the light most favorable to Di-Franco and indulge him all reasonable inferences. *See, e.g., Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984). If the defendants fail to meet their "strict burden of proof," summary judgment will be denied *Id.* But if they carry their burden, DiFranco must shoulder the burden of creating a genuine factual issue; he cannot rest on bare pleadings or bald assertions in doing so. *See* Fed.R.Civ.P. 56(e); *Big O,* 741 F.2d at 163.

■ We will be very brief with the facts,[1] since the record so clearly reveals a factual dispute on the First Amendment issue. DiFranco says that in 1982, he started regularly complaining to Witherell-Niec about misuse of City resources. For

---

1. We take the facts from the complaint and from the summary of testimony and findings made by the hearing officer at DiFranco's discharge hearing.

example, he complained that one co-worker, Richard Paul, was using City equipment to do non-City work during work hours. He also complained that some photos he had taken for the City were being used by then-Mayor Byrne's husband, Jay McMullen, on McMullen's private Christmas cards. Such complaints continued into early 1983, during the divisive mayoral primary between Jane Byrne, Richard Daley and Harold Washington. DiFranco says Witherell-Niec then imposed a gag order on all employes and accused him of violating it, but he denies having gone to the press. DiFranco continued his complaints, accusing another supervisor of using City resources for private and political purposes and of trying to stir up racial prejudice (presumably against Harold Washington) within the Graphics and Reproduction Center. He says that Witherell-Niec told him he could be fired for making such accusations, and that she did suspend him in April of 1983 for that reason. Defendants assert he was suspended for other reasons: for threatening his supervisors, stealing City photographic equipment and general insubordination.

Because DiFranco was a "career service employee," Witherell-Niec did not have the ultimate power to fire him. What she had to do was suspend him and petition the City's Personnel Board to discharge DiFranco. A hearing officer of that Board conducted an adversary hearing. After hearing testimony from various people in DiFranco's department, including his own and Witherell-Niec's, the hearing officer found that Witherell-Niec was correct that DiFranco had made threats, had failed to return City photographic equipment, had unlawfully removed City documents and had been insubordinate. The officer recommended firing DiFranco, which the Personnel Board did. The Board and the officer made no findings as to whether DiFranco's complaints also played a role in Witherell-Niec's suspension of him and whether he would have been suspended even if he

had not complained about misuse of City resources.

Relying on the findings of the Personnel Board, the City argues that no factual issue exists that DiFranco was fired for good cause and not because of his speech. We think a factual issue quite plainly exists.

The parties agree that *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), governs their dispute. *Mt. Healthy* is primarily a case about causation. Once a plaintiff shows that his speech was constitutionally protected, he must carry the burden of showing that his speech or conduct was a "substantial" or "motivating" factor in his firing. If he does so, the public employer may prove that it would have fired the worker anyhow, even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576. This is thus a typical "but-for" test of causation. "But for" DiFranco's speech, would he have been fired?

That is a factual question about which the sparse record yields no clear answer. DiFranco says he was fired because of his complaints; defendants say he was fired for other reasons. Defendants are wrong that the decision of the Personnel Board somehow erases this factual dispute. First, we are not bound by the record created there or by the Board's holding. Defendants do not argue that collateral estoppel applies to the proceedings before the Board. Thus, what the City relies on is the fact that an administrative board found just cause to fire DiFranco. While these findings may ultimately prove relevant and admissible under Fed.R.Evid. 803(8)(C),[2] they do not resolve the factual dispute. At most, they show that one hearing officer resolved some credibility issues against DiFranco. A jury need not and might not agree. A material factual dispute plainly exists both in the record before the Personnel Board and before us.

Second, the defendants fail to recognize that the Personnel Board did not address

**2.** We express no firm opinion on this evidentiary issue. And as should be obvious, we also make no factual findings in this opinion within the meaning of Fed.R.Civ.P. 52.

or decide the factual and legal issue before us. Under *Mt. Healthy,* the question is not simply whether a public employer had reasons other than an employee's protected speech for firing him. An employer could have cause to fire someone but decide not to do it. Rather, the question is whether the protected speech played a substantial, motivating role in the employment decision, that is, whether the employer would have fired the employee had he not spoken up. The existence of just cause is relevant to this issue, but not determinative. The Personnel Board simply did not address or decide this question. Even if we accept for argument its factual findings that DiFranco was insubordinate, threatening and slow to return property, the relevant legal question remains unresolved. Despite his alleged failings, did DiFranco's complaints play a role in Witherell-Niec's decision to suspend him and bring him before the Board? Would she have done so had he not continuously voiced his complaints? These questions—the relevant ones under *Mt. Healthy*—cannot be resolved on the record before us under the demanding standards of Rule 56. Thus, to the extent defendants move for summary judgment on the causation issue, their motion is denied.

Their motion must also be denied to the extent it is based on an alternative argument that DiFranco's speech is unprotected. Defendants belatedly argue (first raising it in their Reply Brief) that causation aside, the record is clear that DiFranco was fired because his speech was highly disruptive. They rely on *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and its progeny, *see Zaky v. Veterans Administration,* No. 85–1741, slip op. at 9–14 (7th Cir.1986); *Linhart v. Glatfelter,* 771 F.2d 1004, 1009–1011 (7th Cir. 1985); *Patkus v. Sangamon-Cass Consortium,* 769 F.2d 1251, 1256–59 (7th Cir. 1985); *Knapp v. Whitaker,* 757 F.2d 827, 838–43 (7th Cir.1985), which define when a public employee's speech is "protected" under the First Amendment. While *Mt. Healthy* addresses whether protected speech caused an injury, *Connick* and its

offspring answer whether that speech is protected in the first place. *Connick* prescribes a two-step inquiry. The court must first decide whether the speech was a matter of "public concern"; only if it is will the court be allowed to intrude into the public employer's "business" decision to fire or discipline an employee. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690; *Patkus,* 769 F.2d at 1257. This is a question of law, not fact, *see Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690, but one that must be determined "by the content, form, and context of a given statement, *as revealed by the whole record."* *Id.* at 147–48, 103 S.Ct. at 1690–91 (our emphasis). Thus, although this is a question "of law," it of course depends on facts. What this means, then, is that the *court* decides whether the speech was of "public concern," but it must do so on the basis of careful scrutiny of a full factual record. If the court decides that the speech does touch issues of public concern it must then weigh the employee's interest as a citizen in commenting on such matters against the interest of the State as an employer in promoting effective and efficient public service. *See, e.g., Knapp,* 757 F.2d at 839. The *Connick* Court considered several factors relevant to the government's interest, such as (1) whether the speech affected the employee's ability to do his job; (2) the time, place and manner in which the speech was delivered; (3) the importance of close working relationships with superiors and co-workers; and (4) the context in which the underlying dispute arose. *Connick,* 461 U.S. at 150–54, 103 S.Ct. at 169–92; *Knapp,* 757 F.2d at 839. The balancing test is also a question of law to be made on the basis of a full record. *See Connick,* 461 U.S. at 150 n. 10, 103 S.Ct. at 1692; *cf. Knapp,* 757 F.2d at 842–43 (analyzing second step as a legal question, relying on fully developed trial record).

Summary judgment is clearly inappropriate at this time. Defendants do not even argue that DiFranco fails to satisfy the first step of the *Connick* test. Even if we ignore the fact that we do not have the

requisite full record, it seems clear that DiFranco's speech touched matters of public concern. The public is acutely concerned with the endemic problem of public employees diverting public resources for private or political use, and the public has a strong, even compelling, interest in having concerned public employees complain vigorously about such practices. Defendants rest on the second part of the *Connick* test, arguing that DiFranco's speech was so disruptive that it threatened to destroy his working relationship with his superiors and co-workers. *See Patkus*, 769 F.2d at 1258. We cannot say on the basis of our undeveloped record that the speech was so disruptive that the City's interest in running a tight ship trumps DiFranco's interest in complaining about misuse of public resources.[3] The relevant cases which raise the question typically answer it on the basis of a trial record. *See Patkus*, 769 F.2d at 1254 (four-day bench trial); *Knapp*, 757 F.2d at 829 (jury trial). At a minimum, there should be a stipulated record or one based on full discovery with undisputed material facts. *See Linhart* (summary judgment following discovery). But here factual disputes exist, as well as credibility issues. We need to have a much fuller picture of the entire employment context—the work environment, the extent of the alleged "corruption," the effect of the mayoral campaign, etc.—in order to intelligently complete the difficult *Connick* balancing test. Summary judgment is therefore inappropriate now.

The City makes an additional motion, however, that does have merit. It argues that the complaint does not sufficiently allege that City policy or custom was responsible for DiFranco's injury, as required by *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny. *"Monell* is a case about responsibility." *Pembaur v. City of Cincinnati*, — U.S. —, —, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452

(1986). In holding that a City could be held liable under § 1983 by virtue of its own policies or customs but not vicariously for the wrongs of its employees, the court distinguished "acts of the *municipality* from acts of *employees* of the municipality," thereby making "clear that municipal liability is limited to action for which the municipality is actually responsible ... that is, acts which the municipality has officially sanctioned or ordered." *Pembaur*, — U.S. at —, 106 S.Ct. at 1298 (emphasis in original). This analysis of course leaves a crucial question unanswered; since a municipality as such is a fiction, composed of nothing but citizens or "employees" ranging from Mayor or councilmember on down, who is the "municipality"? *Monell* answers the question generally by saying that the injury must flow from official government policy, made either by "lawmakers or by those whose acts or edicts may fairly be said to represent official policy." 436 U.S. at 694, 98 S.Ct. at 2037–38. *Pembaur* further explains this language, holding that even a single unconstitutional act of an "employee" can suffice to pin liability on the municipality, so long as that employee is the highest authorized policymaker or decisionmaker for the act in question. Specifically, municipal liability under § 1983 can attach "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at —, 106 S.Ct. at 1300 (plurality opinion).

The parties agree that Witherell-Niec's decision to start discharge proceedings against DiFranco, for allegedly unconstitutional reasons, does not suffice by itself to pin liability on the City. But DiFranco argues that the Personnel Board's decision to uphold her decision essentially ratified or acquiesced in her unconstitutional con-

---

**3.** We are interested here *only* in DiFranco's speech, that is, what he complained of and how he voiced his complaints. The allegations that he stole City property are relevant to the *Mt.* *Healthy* analysis of causation, that is, to the issue of whether he was fired for reasons *other* than protected speech, not to the issue of whether his speech was protected in the first place.

duct. He argues—and the City concedes—that the Board is the final authority on job decisions; he concludes from this fact that its decision to fire DiFranco can fairly be said to be the City's. While that conclusion is probably valid, DiFranco's further conclusion, that liability necessarily flows from that decision, is not.

 Even if we assume that the Personnel Board is the sort of "ultimate" authority contemplated by *Pembaur, see,* 106 S.Ct. at 1300 n. 12, its decision to fire DiFranco is merely a *necessary* but not *sufficient* condition to fastening liability on the City under *Monell.* There must not only be a decision by the "ultimate" authority, but (as *Pembaur* teaches) a "decision *to take unlawful action* made by municipal policymakers." —— U.S. at ——, 106 S.Ct. at 1300 (emphasis added). There must be official sanction *of the unlawful acts.* For example, in *Pembaur* the policymaker—a County prosecutor—not only had ultimate authority to set County policy on the subject matter in question, he made the decision which directly violated Pembaur's Fourth Amendment rights. *Id.* at ——, 106 S.Ct. at 1300. Here there is no indication that the Board made a decision to take unlawful action. That is, the record does not indicate that *it* decided to fire DiFranco *because of his speech,* as Witherell-Niec allegedly did. Rather, it was sitting as an adjudicatory body and made factual findings and credibility determinations based on a record, finding simply that there was just cause to fire DiFranco. As noted earlier, it did not address or answer the First Amendment question. Unless DiFranco can somehow allege in good faith, with some minimal, direct or inferential factual support, *cf. Strauss v. City of Chicago,* 760 F.2d 765 (7th Cir.1985), that the Board tacitly supported Witherell-Niec's alleged decision to fire DiFranco because of his speech,[4] the mere allegation that the Board upheld her result cannot satisfy *Monell* and *Pembaur.* Its presumably good faith decision does not by itself fairly reflect

City policy to punish DiFranco for his speech; it merely shows that the Board believed Witherell-Niec and not him that there were other good reasons to fire him. Whether it was right or wrong in weighing the facts, its decision appears to have been based not on his complaints but on whether DiFranco violated City policy by making threats and not returning City equipment. Absent some indication that the Board actually supported Witherell-Niec's improper motives, this is not an official sanction of or acquiescence in her allegedly unlawful action.

For the above reasons, then, the City will be dismissed under the *Monell* doctrine. Witherell-Niec's motion for summary judgment will be denied. It is so ordered.

---

4. For example, if the Board's decision was pretextual, papering over a decision to fire DiFran- co for speaking out, the Board and the City could be held liable.